IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ERIC POWELL AND <br> LAURY POWELL, <br>       Plaintiffs, <br>  v. <br><br> UNITED TECHNOLOGIES CORPORATION, <br> LEAR CORPORATION EEDS AND <br> INTERIORS, INC., as successor to United <br> Technologies Automotive, Inc., ANDREWS <br> DAIRY STORE, INC., and L.D. WILLIAMS, INC. <br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. 1:17–cv–00028 |

**COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES PURSUANT TO 42 U.S.C. § 6972(a)(1)(B) AND JURY DEMAND**

**I.  NATURE OF ACTION**

1. This is a suit brought by Eric and Laury Powell ("Plaintiffs") to clean up pervasive and dangerous contamination within a residential neighborhood in Andrews, Indiana (the "Neighborhood"). Two overlapping plumes of contamination, consisting primarily of trichloroethylene ("TCE") and petroleum constitute an imminent and substantial endangerment to human health and the environment under, and surrounding, Plaintiffs' property in the Neighborhood.

2. Plaintiffs seek an order from this Court under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.* ("RCRA"), more specifically, Section 6972(a)(1)(B), directing United Technologies Corporation ("UTC"), Lear Corporation Eeds and Interiors, Inc. ("Lear"), Andrews Dairy Store, Inc. ("Andrews Dairy"), and L.D. Williams, Inc. ("L.D. Williams") (collectively, the "Defendants") to immediately take all actions necessary to properly

1

remediate the contamination, and to pay appropriate civil penalties for their ongoing RCRA violations, along with Plaintiffs' costs of litigation pursuant to Section 6972(e).

## II.  BACKGROUND FACTS

3. United Technologies Automotive, Inc. ("UTA") owned and operated a manufacturing facility located at 303 North Jackson Street, Andrews, Indiana (the "UTA Facility"), from approximately 1974 through 1992. UTA was owned and operated as a subsidiary of Defendant UTC until it was sold to Defendant Lear in 1999. UTA used TCE, a powerful degreaser and chlorinated solvent, and released TCE and other hazardous chemicals into the soils and groundwater at the UTA Facility during the course of its operations. The TCE and other hazardous chemicals have contaminated the groundwater under the Facility and have migrated off-site to an extensive area surrounding the UTA Facility (the "Chlorinated Plume").

4. TCE is a chlorinated hydrocarbon that is classified by the United States Environmental Protection Agency ("USEPA") as "carcinogenic to humans" by all routes of exposure. Additionally, exposure to TCE is known to cause damage to the nervous system, the kidneys, the liver, and the lungs, abnormal heartbeat, coma, and possibly death. It has also been associated with cancers like kidney cancer, liver and biliary cancer, and non-Hodgkin's lymphoma.

5. The Chlorinated Plume extends approximately 3,000 feet to the southwest of the UTA Facility, under residential homes in the Neighborhood, and has infiltrated the municipal water supply of Town of Andrews (the "Town"). UTA is well aware of the Chlorinated Plume due to its enrollment of the UTA Facility in the Voluntary Remediation Program ("VRP") operated by the Indiana Department of Environmental Management ("IDEM") in 1994. Despite more than 20 years in the Voluntary Remediation Program, the Neighborhood remains contaminated with unacceptable and dangerous levels of TCE and its associated degradation

2

products (including vinyl chloride). Dangerously high TCE and other hazardous vapors exist in the sub-slab areas beneath homes in the Neighborhood, and UTA has no planned remediation of groundwater to properly and completely remove the source of those vapors. The TCE must be removed from the groundwater and soil at the UTA Facility and throughout the Neighborhood to non-detect levels to eliminate the current exposure and constant threat of exposure to persons within the Neighborhood.

6. Andrews Dairy Store ("the Gas Station") is a Citgo-branded, retail gasoline service center and convenience store located at 155 North Main Street, Andrews, Indiana. The Gas Station is directly downgradient (southwest) of the UTA Facility and sits above the Chlorinated Plume. The Gas Station was formerly owned by Defendant Andrews Dairy Store, Inc., and is currently owned by Defendant L.D. Williams, Inc. (collectively, the "Gas Station Defendants"). During the Gas Station's operations, it has released petroleum into the soils and groundwater from its underground storage tanks. These petroleum products, including gasoline, have resulted in a plume of soil and groundwater contamination (the "Aromatic Plume") that includes benzene, toluene, ethyl benzene, and xylene.

7. The Aromatic Plume extends to the southwest of the Gas Station, under residential homes within the same Neighborhood that is affected by the Chlorinated Plume. The Gas Station Defendants are well aware of the Aromatic Plume due to the Gas Station's enrollment in IDEM's Leaking Underground Storage Tank ("LUST") program in the early 1990s and IDEM's Excess Liability Trust Fund program. Despite more than 20 years of monitoring and remediation, the Neighborhood remains contaminated with unacceptable and dangerous levels of petroleum. In fact, the Gas Station is currently listed as a "high" priority site in the LUST program. Dangerously high petroleum vapors exist in the sub-slab beneath homes in the

3

Neighborhood and have affected Andrews' municipal sanitary sewer system. Similar to the Chlorinated Plume, the Aromatic Plume must be removed from the groundwater and soil at the Gas Station property and throughout the Neighborhood to non-detect levels to eliminate the current exposure and constant threat of exposure to persons within the Neighborhood.

8. As a direct and proximate result of Defendants' wrongful actions and inactions, hazardous chemicals released at the UTA Facility and the Gas Station have entered the environment and migrated through the subsurface soil and groundwater into the Plaintiffs' Neighborhood and continue to migrate into the Neighborhood, posing a threat to human health and the environment. Plaintiffs were and continue to be exposed to TCE, benzene, and other hazardous chemicals by virtue of harmful vapors that have entered and continue to enter their home from the contaminated soil and groundwater and through Andrews' sewer and utility lines. Vinyl chloride, a known human carcinogen and degradation product of TCE, has been detected since 1993 in the Town's public well field. And as recently as March 2016, indoor air sampling of a home in the Neighborhood detected harmful concentrations of TCE and benzene in that home's basement and first floor living space.

9. A federal court order under RCRA is required to finally and completely eliminate this contamination and protect the public and the environment from Defendants' pollution.

### III. THE PARTIES

10. Plaintiff Eric Powell is a citizen of Huntington County, Indiana, and resides within the Neighborhood at 148 N. Main Street, Andrews, Indiana, 46702.

11. Plaintiff Laury Powell is a citizen of Huntington County, Indiana, and resides within the Neighborhood at 148 N. Main Street, Andrews, Indiana, 46702.

12. Defendant UTC is a Delaware corporation, with its corporate office located at 10 Farm Springs Road, Farmington, Connecticut, 06032.

13. Defendant Lear is a Delaware corporation, with its corporate office located at 21557 Telegraph Road, Southfield, Michigan 48033. It is the successor to UTA.

14. UTA operated as a wholly-owned subsidiary of UTC until March 1999, at which time it Lear Corporation acquired it from UTC. UTA's name was changed to Lear Corporation Eeds and Interiors, Inc., and it continues to operate as a subsidiary of Lear Corporation. Upon information and belief, UTC retained certain environmental liabilities arising from UTA's operations at the UTA Facility. As such, all allegations pertaining to UTA are applicable to both UTC and Lear.

15. Defendant Andrews Dairy Store, Inc. is an Indiana corporation, with its principal office located at 138 Snowden Street, Andrews, Indiana 46702.

16. Defendant L.D. Williams is an Indiana corporation, with its principal office located at 155 North Main Street, Andrews, Indiana 46702.

## IV.  JURISDICTION AND VENUE

17. Under section 7002 of RCRA, 42 U.S.C. § 6972(a), citizens are granted a private right of action. Recognizing that the limited resources of federal and state environmental agencies do not permit these agencies to enforce RCRA adequately in all respects, Congress intended "citizens suits" to be an integral part of the overall enforcement scheme of RCRA. Section 6972(a) provides in pertinent part:

> Any action under [42 U.S.C. § 6972(a)(1)] shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. . . . The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, . . . and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

18. Pursuant to 42 U.S.C. § 6972(a), this Court has jurisdiction over the parties and

5

exclusive jurisdiction over the subject matter of this cause.

19. Venue is proper in this district under 28 U.S.C. § 1391 because: (a) all of the hazardous and solid waste contamination to the environment has taken place in this district; and (b) the acts and omissions that are the subject of this Complaint occurred in this district.

## V.  SATISFACTION OF ADDITIONAL JURISDICTIONAL REQUIREMENTS

20. The Administrator of the USEPA has not commenced prosecution, nor is she diligently prosecuting, any action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") of the type set forth in 42 U.S.C. § 6972(b)(2)(B) with respect to the UTA Facility, the Gas Station, and/or the Neighborhood.

21. The State of Indiana has not commenced, nor is it diligently prosecuting, a RCRA action or CERCLA action of the type set forth in 42 U.S.C. § 6972(b)(2)(C).

22. Proper notice has been given to the Administrator of the USEPA, the State of Indiana, and to all other persons as required by the provisions of 42 U.S.C. § 6972(b)(1)(A) and 6972(b)(2)(A) and 40 C.F.R. Part 254. A copy of the notice is attached hereto as **Exhibit #1**.

## VI.  GENERAL ALLEGATIONS

23. Plaintiffs own and reside in a home located within the Neighborhood. Their home and many other properties within the Neighborhood are connected to municipal sewer and utility lines, and have basements or crawl spaces composed of concrete, bare soil, or both.

24. Groundwater underlying the UTA Facility flows to the southwest, and directly toward the Neighborhood.

25. When contaminated groundwater underlies a home, the TCE may rise through the soil, through a process known as volatilization, to create harmful and sometimes deadly vapors. Additionally, the contaminated groundwater has infiltrated the Town's sanitary sewer system and other utility lines.

26. Vapors from subsurface contamination can enter utility lines, such as sanitary sewers, which act as preferential pathways to bring vapor contamination into homes and other buildings.

## VII. UTA'S OPERATIONS AT THE UTA FACILITY AND DISCOVERY OF THE CHLORINATED PLUME

27. UTA began operations at the UTA Facility in 1974, manufacturing steel and brass fittings.

28. Throughout its nearly 20-year operating history, UTA purchased, stored, used, and disposed of TCE and other hazardous chemicals.

29. UTA operated a 3,000 gallon above-ground storage tank and a 2,500 gallon above-ground storage tank at the UTA Facility, both of which stored virgin TCE.

30. UTA's operations also included two TCE degreaser pits that were located inside the UTA Facility along the south interior wall. The degreaser pits were approximately 18.5 feet long, 15 feet wide, and two feet deep, with a concrete sump that was approximately two feet deep.

31. TCE from the degreaser pits was reclaimed in solvent stills located adjacent to the pits.

32. TCE frequently overflowed the degreaser pits, causing the TCE to enter the soils and groundwater beneath the UTA Facility.

33. UTA purchased approximately 44.5 tons of TCE per year.

34. UTA used TCE as a degreasing solvent and generated a large amount of TCE waste.

35. UTA operated the UTA Facility until 1992.

36. In connection with UTA's discontinuation of its operations in 1992,

environmental site assessments were performed at the UTA Facility.

37. The initial site investigations were performed in September and October 1992 and revealed to UTA the existence of the Chlorinated Plume.

38. TCE was detected in the groundwater underlying the UTA Facility in concentrations as high as 1,000,000 parts per billion ("ppb") in June 1994.

39. The Maximum Contaminant Level ("MCL") established by the USEPA for TCE is 5 ppb, and the Maximum Contaminant Goal ("MCG") is 0 ppb.

40. The Chlorinated Plume extends approximately 3,000 feet southwest of the UTA Facility. (**Exhibits #2 & #3**.)

41. The Town uses three water supply wells, which are located approximately 2,700 feet downgradient of the UTA Facility.

42. The Chlorinated Plume extends to the Town well field and has infiltrated the well field, and as a result, a water treatment system, which consists of a packed tower air stripper, was installed by UTA at the Town well field in 1994.

43. Groundwater is drawn from each of the Town's three wells on a rotating basis and is combined into a large holding tank prior to being treated by the air stripper. After passing through the air stripper, the water is available to the Town's utility for final treatment before distribution to residential customers.

44. On July 7, 1994, UTA filed an application with IDEM to be admitted into the VRP. *See* Ind. Code § 13–25–5–1, *et seq*.

45. The VRP, which is entirely voluntary, can be used to avoid regulatory enforcement of environmental cleanup laws. However, VRP participants, like UTA in this case, often take advantage of the VRP and fail to timely and properly remediate contamination for

decades, allowing harmful contamination to persist in drinking water sources and as vapors within residential neighborhoods.

46. In its VRP Application, UTA admitted it had caused the Chlorinated Plume, stating, "[t]he current and former TCE ASTs on the former UTA plant property appear to be the main source areas for solvent contamination of the soil and groundwater on the plant property."

47. On August 2, 1994, IDEM sent a letter to UTA stating that UTA had been admitted into the VRP and had been assigned Site Identification No. 6930702.

48. On October 20, 1994, UTA and IDEM signed a Voluntary Remediation Agreement ("VRA").

49. In January 1994, dense non-aqueous phase liquid ("DNAPL") was observed in the groundwater at the UTA Facility. Laboratory analysis confirmed that the DNAPL contained TCE.

50. The presence of DNAPL was significant, as it is generally the most heavily-concentrated form of contamination and poses the greatest challenges in remediation.

51. Soil sampling conducted in May and September 2001 at the UTA Facility detected TCE concentrations as high as 340,000 ppb in the former TCE degreaser area.

52. UTA has undertaken several inadequate measures to control and remove contamination, and as a result, harmful contamination continues to migrate into the Neighborhood.

53. Monitoring wells throughout the Neighborhood continue to show high levels of TCE in the groundwater.

54. For instance, groundwater sampling conducted in March 2016 showed concentrations of TCE as high as 1,170 ppb in an off-site monitoring well.

9

55. The TCE and vinyl chloride contamination from the underlying Chlorinated Plume continues to pose a risk to the homes and businesses within the Neighborhood.

56. Despite the passage of 22 years as a "voluntary participant" in IDEM's VRP, UTA has never completed its Remediation Work Plan, sources of contamination at the UTA Facility have not been remediated, and the Neighborhood remains contaminated to unacceptable levels.

## VIII. THE GAS STATION'S OPERATIONS AND DISCOVERY OF THE AROMATIC PLUME

57. The Gas Station is a retail gasoline center and convenience store that has been in operation since the 1960s.

58. The Gas Station operated four underground storage tanks ("USTs")—one 10,000 gallon gasoline tank, one 8,000 gallon gasoline tank, one 4,000 gallon diesel tank, and one 1,000 gallon kerosene tank.

59. All four USTs were installed in 1979.

60. The 1,000 gallon kerosene UST was removed on June 9, 1998. Upon information and belief, the other three USTs are still used today.

61. In April 1993, Huntington County notified IDEM as to the presence of petroleum vapors in the Town's municipal sanitary sewer system—specifically, in a sewer line beneath North Main Street. There was also petroleum sheen on the water within the sewer line.

62. A subsequent investigation indicated that petroleum vapors were present in residences sourced from the sewer line and that the impact to the sewer line was attributable to a fuel release from the UST(s) at the Gas Station.

63. Because the petroleum contamination resulted from a release from a UST, the Gas Station was placed by IDEM in its Leaking Underground Storage Tank ("LUST") program.

64. IDEM assigned the Gas Station LUST Identification No. 1993-04-288.

65. In July 1993, the Gas Station installed a groundwater/fuel recovery system in a trench adjacent to the utility corridor along Main Street, which removed over 900 gallons of gasoline by the fall of 1993.

66. However, significant and dangerous quantities of gasoline were left unremediated.

67. In September 1993, the Gas Station retained EnviroScience Inc. to conduct an environmental site investigation to determine the extent of subsurface petroleum impacts at the site.

68. After its investigation, EnviroScience submitted a corrective action plan to IDEM on April 24, 1995 (the "1995 CAP"), which recommended use of a pump-and-treat system and an in-situ bio-augmentation system.

69. The 1995 CAP was never approved and, therefore, this system was never installed.

70. In October 1999, SES Environmental prepared a different corrective action plan on behalf of the Gas Station (the "1999 CAP"), which recommended monitored natural attenuation as the chosen remediation approach.

71. "Monitored Natural Attenuation" means, in layman's terms, that no actual cleanup effort will be made; instead, the contamination is allowed to persist in the subsurface and "nature" (*i.e.*, soil bacteria) will—over decades in many cases—"eat" the contamination.

72. IDEM approved the 1999 CAP on December 17, 1999.

73. On October 6, 2004, SES sent a letter to IDEM indicating that monitored natural attenuation was not working as expected and that closure could no longer be attained under that approach.

74. Additional monitoring wells were installed on the Gas Station's property and off-site to further delineate the extent of the Aromatic Plume.

75. On July 25, 2005, SES sent a letter to IDEM, on behalf of the Gas Station, responding to IDEM's request for information concerning potential receptors and exposure pathways related to the release of petroleum at the Gas Station.

76. In that letter, SES indicated the following findings:

   a. There is a potential for inhalation exposure via vapor intrusion into the site building, and residential basement/crawl spaces; and

   b. The sanitary sewer and county drain tile (north portion of site) are potential contamination migration pathways. Migration along the county drain tile would result in environmental exposure at the outfall to Loon Creek.

77. Even though SES concluded in 2005 that "[t]here is a potential for inhalation exposure via vapor intrusion into . . . residential basement/crawl spaces[,]" the Gas Station has not conducted any of its own indoor air testing to determine the existence of vapor intrusion in homes in the Neighborhood.

78. Despite the Gas Station's investigation and remediation work, IDEM stated in a letter dated March 8, 2012, that "[p]lume expansion appears to be occurring. . . ."

79. SES conducted quarterly sampling in November 2015, which detected high concentrations of benzene in both on-site and off-site monitoring wells.

80. For instance, in MW-3, which is located on-site close to the UST area, benzene was detected at 17,100 ppb in the shallow groundwater. In MW-11 and MW-28, which are both off-site in the Neighborhood, benzene was detected in the shallow groundwater at 149 ppb and 133 ppb, respectively.

81. The MCL established by the USEPA for benzene is 5 ppb.

82. Petroleum contamination is continuing to migrate from the Gas Station onto

Plaintiffs' property, and onto other properties within the Neighborhood.

83. The contamination from the underlying Aromatic Plume continues to pose a risk to Plaintiffs and their property, and to the homes and businesses within the Neighborhood.

84. The vapors from petroleum compounds, including benzene, emanating from the Gas Station present a current and significant danger to the Plaintiffs and to residents within the Town.

## IX. VAPOR INTRUSION

85. The Chlorinated Plume and the Aromatic Plume (collectively, the "Contamination") is a current source of toxic vapors throughout the Neighborhood.

86. As illustrated in the IDEM diagram attached hereto as **Exhibit #2**, soil and groundwater contamination can cause vapors to enter homes and other aboveground structures.

87. In addition, groundwater impacted by the Contamination has infiltrated the Town's sewer lines.

88. The Town's sewer lines provide a preferential pathway for the Contamination vapors, thereby enabling vapors to impact any home connected to an infiltrated sewer line.

89. In fact, dangerous vapors from the Defendants' Contamination continue to be present in the indoor air of Plaintiffs' home and other homes in the Neighborhood.

90. For instance, in February 2016, Stantec (another of UTC's environmental consultants) sampled the indoor air in a home in the Neighborhood and, upon receiving the results in March 2016, indicated that TCE concentrations in that home's basement and first floor—4.5 and 3.0 μg/m3, respectively—were higher than IDEM's published screening level of 2.1 μg/m3. The sampling results also detected benzene in the air within that home.

91. Defendants have not taken measures to adequately inform residents of the health risks associated with exposure to TCE, benzene, and other human carcinogens, or the potential

duration of their exposure.

92. Neither Plaintiffs nor, on information and belief, other residents within the Neighborhood have been informed by Defendants of the past or present risk of vapors from the Contamination.

93. Additionally, many homes in the Neighborhood have never been tested for vapor intrusion, yet likely have been and continue to be impacted by vapors from the Contamination.

94. Furthermore, on information and belief, the vast majority of the former and current residents of the Neighborhood were never informed at any point in time about the existence of Contamination vapors in the Neighborhood, or the adverse health risks associated with exposure to TCE, vinyl chloride, benzene, and other human carcinogens.

### X.  HEALTH RISKS ASSOCIATED WITH TCE AND BENZENE EXPOSURE

95. Both TCE and benzene have been characterized by the USEPA as "carcinogenic to humans" by all routes of exposure.

96. On June 12, 2007, Dr. Thomas Sinks, Deputy Director of the Agency for Toxic Substances & Disease Registry and of the National Center for Environmental Health at the Centers for Disease Control and Prevention testified before a Congressional subcommittee concerning the toxic health effects of TCE.

97. During his testimony, Dr. Sinks stated, "[o]ccupational exposure to TCE may cause nervous system effects, kidney, liver and lung damage, abnormal heartbeat, coma, and possibly death" and "also has been associated with adult cancers such as kidney cancer, liver and biliary cancer and non-Hodgkin's lymphoma."

98. Benzene is a known human carcinogen. Studies have shown that benzene exposure can cause cancers in humans, including: leukemias, like acute myelogenous, acute lymphocytic, acute erythroleukemic, acute undifferentiated, chronic lymphocytic, hairy cell,

acute promyelocytic, and chronic myelogenous; lymphomas, such as Hodgkin's lymphoma, non-Hodgkin's lymphoma, and lymphosarcoma; and other cancers, such as multiple myeloma, and reticulum cell sarcoma.

99. The USEPA has also stated that exposure to benzene vapors can cause neurologic, immunologic, and hematologic effects, and can also cause both structural and numerical chromosomal aberrations.

100. The presence of Defendants' TCE, vinyl chloride, benzene, and other aromatic chemicals on the Plaintiffs' property and within their home constitutes an immediate human health risk.

### XI.  COUNT I: RCRA CITIZENS' SUIT 42 U.S.C. § 6972(a)(1)(B)

101. Plaintiffs hereby incorporate paragraphs 1 through 100 of this Complaint as if fully restated herein.

102. The Defendants are "person[s]" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

103. The Defendants are "past or present generator[s]" and/or "past or present owner[s] or operator[s] of a treatment, storage, or disposal facility" within the meaning of 42 U.S.C. § 6972(a)(1)(B), and have and/or are contributing to the past or present handling, storage, treatment, transportation, or disposal of "solid" or "hazardous waste" within the meaning of 42 U.S.C. § 6972(a)(1)(B).

104. The Defendants caused or contributed to a condition that presents or may present an imminent and substantial endangerment to health or the environment because the Defendants generated "solid wastes" or "hazardous wastes" and released such wastes into the unrestricted environment in their course of improperly handling, storing, and/or disposing of such wastes during their ownership and/or operation of the UTA Facility and/or the Gas Station.

105. Plaintiffs are entitled to relief under RCRA Section 7002(a), 42 U.S.C. § 6972(a), restraining Defendants and requiring them to take action, including a complete, timely, and appropriate investigation and abatement of all actual and potential endangerments arising from the released "solid waste" and "hazardous waste" at and emanating from the UTA Facility, the Gas Station, and the Neighborhood as may be necessary to abate the actual and potential endangerment at issue.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Declare that Defendants' past and/or present treatment, handling, storage, transportation, and disposal of solid and/or hazardous waste presents, or may present, an imminent and substantial endangerment to public health and/or to the environment in violation of RCRA;

2. Declare, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 6972(a), that the Defendants must take all necessary action to comply with RCRA (and regulations promulgated thereunder, including Indiana's applicable hazardous waste management regulations), to investigate, abate and otherwise respond to potential endangerments associated with the highly toxic solid and/or hazardous waste that is impacting the UTA Facility, the Gas Station, and the Neighborhood;

3. Award Plaintiffs all other appropriate injunctive relief;

4. Order Defendants to pay the costs of litigation, including but not limited to reasonable attorney and expert witness fees, as authorized by 42 U.S.C. § 6972(e);

5. Order Defendants to pay appropriate civil penalties of up to $25,000 per day of noncompliance for each violation of RCRA, as authorized by 42 U.S.C. § 6972(a);

6. Maintain continuing jurisdiction of this action to the extent necessary and for as

long as necessary to enforce and interpret, and to review Defendants' compliance with this Court's orders; and

    7.    Grant all such further relief as the Court deems just and appropriate.

## XIII.  JURY DEMAND

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ *Thomas A. Barnard*
Thomas A. Barnard, Attorney No. 4011–49
Rodney L. Michael, Attorney No. 23681–49
Benjamin A. Wolowski, Attorney No. 33733–49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
(317) 713–3500

*Attorneys for Plaintiffs*